United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANLEY G. MILLER,<br><br>         Plaintiff(s),<br>   v.<br><br>PIXAR ANIMATION STUDIOS, INC., et al.,<br><br>         Defendant(s).<br>_____/ | NO. C 02-04748 JW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

### I.  INTRODUCTION

In this lawsuit, Plaintiff Stanley G. Miller ("Miller") claims that the lead characters "Mike" and "Sullivan" in the Disney movie "Monsters, Inc." infringe his copyright in his characters "Wise G' Eye" and "Fred Flypogger."  Copies of the depictions of "Mike" and "Sullivan" are shown in **Figure 1** of this Order.  Miller has sued Defendants Pixar Animation Studios, Inc., Disney Enterprises and Chronicle Books LLC (collectively "Defendants") alleging claims of copyright infringement and false designation of origin.  Presently before this Court is Defendants' Motion for Summary Judgment.  On Thursday, February 24, 2005, this Court held a hearing regarding Defendants' motion.  Based upon the arguments advanced by counsel at the hearing and in their papers, Defendants' motion is granted in part and denied in part.

### II.  BACKGROUND

Plaintiff Stanley Miller has been a professional artist since approximately 1959, usually going by the pseudonyms "Stanley Mouse" or "Mouse." (Declaration of Stanley G. Miller, Docket Item No. 106, hereinafter "Miller Decl.," ¶ 2.)  In or around 1960, Miller began to create and draw a variety of

1 "monster" characters and to publish them for use in posters, catalogs, T-shirts, and other clothing
2 articles, cartoons and collectible items. (Miller Decl., ¶ 4.) Plaintiff published many of these items in
3 combination with the trade name "Monster" and "Mouse Monster Shirts." (Miller Decl., ¶ 5.)

4 One of Miller's claimed characters is a small one-eyed creature, described as Character "A"
5 in the Complaint, and is depicted in **Figures 2 - 7 and 13**. (See Complaint at ¶ 10.) Character "A"
6 first appeared in publications by Miller in 1963. Up to 1998, Miller published various works
7 including Character "A." In these publications, Miller had not given a name to Character "A." In
8 1998, Miller named him "Wise G'Eye." (Miller Decl., ¶ 6.)

9 Another of Plaintiff's claimed characters is called "Fred Flypogger," and is identified as
10 Character "B" in the Complaint. Various images of Character "B" are shown in **Figures 2 and 8 - 13**
11 of this Order. Character B appears as "a happy-go-lucky male monster with large biceps, expressive
12 eyes, big hands, a broad smile and a big belly." (Plaintiff's Opposition at 3:18-20.) Character "B"
13 was created in around 1960. (Stanley G. Miller's Memorandum of Points and Authorities in
14 Opposition to Defendants' Motion for Summary Judgment, Docket Item No. 100, hereinafter "Miller's
15 Opposition," at 3:18.) Character "B" was often depicted as a character in a "hot rod," and as a larger
16 buddy to Character "A." (Miller Decl., ¶ 7.)

17 Plaintiff published and distributed drawings of Characters "A" and "B" in most of the same
18 catalogs and club cards. (See Plaintiff's Opposition at 3:20-21.) One of these catalogs, entitled
19 "More of the Most by Mouse! No. 5," was registered with the United States Copyright Office on
20 October 17, 1964 (No. B71710), and renewed on November 6, 1991 (No. RE-550-444). (Stanley G.
21 Miller's Request for Judicial Notice in Opposition to Defendants' Motion for Summary Judgment,
22 Docket Item No. 102, hereinafter "Plaintiff's Request for Judicial Notice," ¶ 1.)

23 In December 1997, Plaintiff and his agent, Anmarie Linsley, began creating the treatment for a
24 cartoon called "Excuse My Dust." (Plaintiff's Opposition at 4:14-15; Defendants' Motion for
25 Summary Judgment; Memorandum of Points and Authorities in Support Thereof, Docket Item No. 77,
26 hereinafter "Defendants' Motion," at 7:3-4.) "Excuse My Dust" contains a mixture of old and new art,

2

1 including drawings of Characters "A" and "B." (Plaintiff's Opposition at 4:18-20.) After completing
2 the "Excuse My Dust" treatment, Plaintiff caused copies of the treatment and accompanying script to
3 be released in or about 1998 for distribution to potential purchasers of the story and artwork.
4 (Complaint at ¶ 15.) It was during this time that Mr. Miller believes that the story and artwork thereby
5 became available to Defendants. (Id.) Mr. Miller registered his copyright to "Excuse My Dust" with
6 the United States Copyright Office on January 31, 2002. (Plaintiff's Request for Judicial Notice, ¶ 2.)

7 On October 1, 2002, Plaintiff filed an action for copyright infringement and false designation
8 of origin, alleging that Defendants used copies of Character "A" and Character "B" in a movie entitled
9 "Monsters, Inc.," and in products, advertising, books and other items relating to that movie.
10 Defendants moved for summary judgment as to all of Miller's claims on December 17, 2004, arguing,
11 inter alia, that Defendants had no access to "Excuse My Dust," and that Plaintiff cannot show that he
12 has a valid copyright in the assortment of "hot-rod" drawings for T-shirts that he created in the early
13 1960s.

### III. STANDARDS

15 Summary judgment is proper when there is no genuine issue as to any material fact and the
16 moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The purpose of
17 summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v.
18 Catrett, 477 U.S. 317, 323-24 (1986).

19 A movant for summary judgment always "bears the initial responsibility of informing the
20 district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions,
21 answer to interrogatories, and admissions on file, together with the affidavits, if any' which it believes
22 demonstrate the absence of a genuine issue of material fact." Id. at 323. If the movant does not satisfy
23 this initial burden, the non-movant has no obligation to produce anything and summary judgment must
24 be denied. If, however, the movant meets this initial burden, then the burden shifts to the non-movant
25 to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. In other
26 words, to preclude entry of summary judgment, the non-movant must bring forth genuine issues of

3

1  material fact. An issue of fact is "genuine" if it can reasonably be resolved in favor of either party.
2  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "material" if it
3  "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant
4  or unnecessary will not be counted." Id. In short, the non-movant "must do more than simply show
5  that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith
6  Radio, 475 U.S. 574, 586 (1986).

7  It is this Court's responsibility "to determine whether the 'specific facts' set forth by the non-
8  movant, coupled with undisputed background or contextual facts, are such that a rational or reasonable
9  jury might return a verdict in its favor based on that evidence." T.W. Elec. Serv. v. Pac. Elec.
10 Contractors, 809 F.2d 626, 631 (9th Cir. 1997). "Where the record taken as a whole could not lead a
11 rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita,
12 475 U.S. at 587. In conducting its analysis, this Court must draw all reasonable inferences in favor of
13 the non-movant. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson,
14 477 U.S. at 255).

### IV. DISCUSSION

**A. Copyright Claim**

17 To establish a successful copyright infringement claim, Plaintiff must show that he owns the
18 copyright and that Defendants copied protected elements of that work. See, e.g., Narell v. Freeman,
19 872 F.2d 907, 910 (9th Cir. 1989). Because in most copyright cases direct evidence of copying is not
20 available, a plaintiff may establish copying by showing that the infringer had access to the work and
21 that the two works are substantially similar. Id.

22 Plaintiff claims that "in or about 2001 and continuously since, [D]efendants infringed on [his]
23 copyright to Character A and Character B." (Complaint at ¶ 38.) Miller has registered only two
24 works which include Characters A and B: "More of the Most by Mouse #5," registered in 1963 and
25 renewed in 1991, and "Excuse My Dust," registered in 2002. Therefore, Miller's copyright
26 infringement claims are limited to those registrations. The Court will address the legal viability of

4

each registered work in turn.

**1. "More of the Most by Mouse #5"**

As a threshold matter, Defendants argue that between 1959 and 1963, before Miller registered his copyright, he had published works containing the same characters. Defendants contend, therefore, that any copyright protection which Miller can derive from his 1963 registration of "More of the Most by Mouse" is "thin," meaning he is entitled to only the unique elements of the images that are not already in the public domain.

It is undisputed that Miller has no evidence of a valid, registered copyright for the drawings of Characters A and B that appeared on T-shirts and in T-shirt catalogs between 1959 and 1963. In support of its argument, Defendants submitted Miller's Catalogs Nos. 1 through 4. These Catalogs do not contain any copyright notices, nor were they ever registered or renewed. Miller conceded at oral argument that the T-shirt catalogs referred to by Defendant did in fact enter into the public domain. Consequently, the stringent notice requirements of the Copyright Act of 1909 dictate that to the extent Characters "A" or "B" were contained in the four catalogs they became irretrievably committed to the public domain.

**a. Character "A"**

Catalogs 1 through 4 contain no images of Character "A." In fact, neither party has provided evidence showing the existence of Character "A" in any work prior to the 1963 "Mouse! Monster Club" club card, attached to Miller's Complaint as Exhibit 1. Accordingly, Defendants' argument that "the catalogs, and all the drawings within them, immediately and irrevocably entered the public domain when they were initially published and distributed by Miller between 1960 and 1963" does not apply to the drawings of Character "A." (See Defendants' Reply in Support of Motion for Summary Judgment, Docket Item No. 112, hereinafter "Defendants' Reply," at 9:23-25.)

However, the public domain consideration of Character "A" does not stop here. Miller admits that an image of Character "A" as depicted in **Figure 6** of this Order was published in 1963 on a membership card for "Mouse! Monster Club." (Complaint at ¶ 11.) By publishing the card with a

1  proper notice, Miller secured copyright protection of the Character "A" image under the 1909 Act.
2  See 17 U.S.C. § 10 (1909 Act).  Copyright protection of Character "A" began on the date of
3  publication and continued for twenty-eight years from that date.  See 17 U.S.C. § 24 (1909 Act); See
4  also Batjac Productions Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1226 (9th Cir. 1998).
5  Before the expiration of the twenty-eight-year period, the copyright could have been renewed for
6  another twenty-eight-year term.  Twin Books Corp. v. Walt Disney Corp., 83 F.3d 1162, 1165 (9th
7  Cir. 1996).  In order to secure this additional protection, Miller would have had to renew his
8  copyright in the membership card by the end of 1991.  Miller has not offered any evidence to show
9  renewal or registration of the club card, and this Court finds that Character "A" entered the public
10 domain upon the expiration of its copyright protection in 1991.  See 3 Nimmer on Copyright §
11 9.05[B][1] (2004).

12      Character "A" as shown in **Figure 7** of this Order was included in the 1963 registered
13 publication "More of the Most by Mouse."   The question then becomes whether this later registration
14 revived copyright protection in Character "A."  The copyright protection secured by Miller for "More
15 of the Most by Mouse" covers no more than those elements of **Figure 7** that are not already in the
16 public domain from **Figure 6**.  See Satava v. Lowry, 323 F.3d 805, 812 (9th Cir. 2003) (finding the
17 scope of Plaintiff's copyright protection of glass-in-glass jellyfish sculptures narrow, covering only
18 those original elements that were not already in the public domain).  The Court finds it beyond genuine
19 dispute that all of the elements of **Figure 7** are present in **Figure 6**.  Thus, all of the elements of
20 Character "A" as depicted in **Figures 6 and 7** are in the public domain and may not be the basis of a
21 copyright violation claim.  Defendants are entitled to summary judgment on this issue.

22      **b.  Character "B"**

23      As previously stated, Miller conceded at oral argument that Catalogs 1 through 4 fell into the
24 public domain.  Character "B" as depicted in **Figures 8 - 10** was included in the catalogs that entered
25 the public domain.  Despite his concession, Miller seeks to raise a disputed factual issue by
26 contending that there is a factual dispute over whether Catalogs 1 through 4 were published before or
27
28      6

after Catalog 5. This dispute is not genuine. In his deposition, Miller identified Catalogs 2 through 4 and assigned them dates ranging from 1959 through 1963:

> Q. Mr. Miller, we have marked as Exhibit No. 51 a document that's called "Mouseville." It's Bates stamped 605 through 612. Could you identify this, these?
> A. Yeah. This is one of my first catalogs.
> Q. Do you know the date for this?
> A. Probably about '59.

(Declaration of David R. Eberhart in Support of Defendants' Reply in Support of Motion for Summary Judgment, Docket Item No. 111, hereinafter "Eberhart Decl.," Ex. H at 100:4-10.)

> Q. Exhibit No. 52 is Bates stamped 613 through 625. And it's entitled, "Mouse Weirdo Shirts, Catalog No. 3."
> Do you recall the date for this catalog?
> A. Maybe '62. Not sure if this was before this – this one or not. Hmm. I thought they were all numbered, but this one doesn't have a number on it.
> Q. Were these –
> A. Oh, I know. This was a – this was a – it's in different form.
> Q. Exhibit 52 is in a different form?
> A. Yeah, this was a color cover, and these were – it was folded in half. This was more of a booklet.
> This was after this one, right.
> Q. So Exhibit 52 was after Exhibit 51?
> A. Yeah. These catalogs spanned from '59 through '63. And this was the third one, this was the second one, and this is the fourth one.
> Q. Okay. So the record is clear, the first catalog you believe was Exhibit 51?
> A. That's the second catalog.
> Q. I'm sorry, the second catalog is Exhibit 51?
> A. The first one was the one with the Mickey Mouse ears on it. Excuse me. The Mickey Mouse-type ears.
> Q. Okay. So that was your first catalog; the second –
> A. That you referred to as Mickey Mouse ears.
> Q. – the second catalog was Exhibit 51; the third catalog was Exhibit 52; and the fourth catalog is Exhibit 44 –
> A. Yeah.
> Q. – is that correct, Mr. Miller?
> A. Right.

(Eberhart Decl., Ex. H at 100:18-102:5.)

Given the chronological numbering of the catalogs and Miller's testimony, the Court finds it beyond genuine dispute that the drawings contained in Catalogs Nos. 1 through 4 entered the public

7

1 domain before Miller's registration of Catalog No. 5, "More of the Most by Mouse #5." Therefore, as
2 a matter of law, Character "B," as depicted in **Figures 8 - 10**, irrevocably entered the public domain
3 when that character was published and distributed by Miller between the years of 1959 and 1963.
4 When Miller registered a copyright for Character "B" in 1963 as depicted in **Figures 11 - 12**, that
5 registration did not recapture copyright protection for Character "B," and Defendants are entitled to
6 summary judgment on this issue.

**2. "Excuse My Dust"**

As a final matter, the Court must consider whether Miller has a basis for copyright recovery for Characters "A" or "B" based on a 2002 copyright for a publication called "Excuse My Dust." Miller's ownership of a copyright in "Excuse My Dust" is not in dispute. Miller secured ownership of his copyright to "Excuse My Dust" in 2002 under the Copyright Act of 1976. Under the Copyright Act of 1976, however, a copyrighted work is entitled to protection if it has not become part of the public domain prior to the Act's effective date of January 1, 1978. See, e.g., Academy of Motion Pictures Arts and Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1451 (9th Cir. 1991).

**a. Character "B"**

Having found that Character "B" entered into the public domain between the years of 1959 and 1963, the Court finds that Miller is not entitled to protection of Character "B" under the Copyright Act of 1976 due to its entry into the public domain before the effective date of the 1976 Act. Character "B" as depicted in "Excuse My Dust" is shown in **Figures 2 and 13**. The Court finds that all of the elements of Character "B" in "Excuse My Dust" are in the public domain and may not be the basis of a valid copyright claim. Thus, Defendants are entitled to summary judgment on this issue.

**b. Character "A"**

As to Character "A," this character was given the name "Wise G'Eye" for purposes of the "Excuse My Dust" treatment. In "Excuse My Dust," Character "A" evolves from a winged eyeball to a walking, green, round one-eyed character. The evolution of Character "A" can be seen in **Figure 3**. Miller contends that the round, green, single-eye appearance of "Wise G'Eye" is copied in the

8

1  Defendants' character "Mike." Given the apparent physical differences between "Wise G'Eye" and
2  the earlier versions of Character "A," Miller may be entitled to copyright protection for the elements
3  in Character "A" which appear in "Excuse My Dust" for the first time.

4  Defendants' primary theory regarding this work is that Miller has failed to demonstrate that
5  Defendants had access to "Excuse My Dust." To establish access, Miller must show that Defendants
6  had a reasonable opportunity to copy "Excuse My Dust" before creating "Monster's, Inc." See Sid &
7  Marty Krofft Television Prods. v. McDonald's Corp., 562 F.2d 1157, 1172 (9th Cir. 1977).

8  In his deposition, Miller testified that he first gave the "Excuse My Dust" treatment to his
9  agent, Anmarie Linsley, to market it to studios and producers in March of 1998 when he completed
10 that work. (Eberhart Decl., Ex. H at 121:9-17.) It is undisputed that the design for the character of
11 "Mike" was drawn by April 6, 1998. Thus, the period in which Defendants could have potentially
12 accessed Miller's treatment is limited to the time frame of March of 1998 when Miller finished
13 "Excuse My Dust" to April 6, 1998 when Miller concedes the character of "Mike" was created.

14 Miller's principle theory of access is based on Jeff Mann, an artist with Industrial Light and
15 Magic (an affiliate of Lucasfilm, Ltd., the entity from which Pixar was born). In March of 1998,
16 Miller gave Mr. Mann a copy of one of the pages from "Excuse My Dust"–a drawing of "Wise G'Eye"
17 with his girlfriend "Lucretia," which can be found at **Figure 4**. Mr. Mann worked briefly with Jon
18 Lasseter, a Pixar employee, in the early 1980's, and the two remain friends. Mann testified that he did
19 not show "Excuse My Dust" to Lasseter. (Mann Dep. 45:1-9.) Nevertheless, it is undisputed that he
20 was in possession of Miller's drawing prior to the April 6, 1998 creation date of Mike. Although the
21 Court finds that Miller has offered only circumstantial evidence that Defendants had access to "Wise
22 G'Eye," construing all facts most favorably to Miller, the Court finds that this is sufficient to raise a
23 question of fact to preclude summary judgment.

24 In the trial of this case, the jury may be instructed that even if it finds insufficient evidence of
25 access, they will be permitted to find copying and infer access on the basis of "striking similarity."
26 See Baxter v. MCA, Inc., 812 F.2d 421 (9th Cir. 1987). While the Court declines to determine

27

28                                                   9

whether the drawings of "Wise G'Eye" and "Mike" are in fact "strikingly" similar, the Court finds that there are sufficient articulable similarities between the two characters for there to be an issue of fact regarding "striking similarity," and will leave this issue to be decided by the trier of fact.

Defendants propose an alternate theory for their entitlement to summary judgment: the independent creation of the allegedly infringing elements of "Monsters, Inc." before the creation and distribution of "Excuse My Dust." It is Defendants' contention that "[t]he undisputed facts demonstrate that all the challenged elements of 'Monsters, Inc.' were all created before 'Excuse My Dust.'" However, contrary to Defendants' assertions, a factual dispute does exist with respect to the date on which Defendants had created the first drawing of "Mike" in "Monsters, Inc." While Defendants contend that the design for the character that became "Mike" was drawn by the visual development artist Ricky Nierva between May 5 and August 18, 1997, Miller has submitted evidence to support his theory that "Mike" was drawn no earlier than April 6, 1998, after the creation of "Excuse My Dust." Because a reasonable jury may return a verdict in Miller's favor based on that evidence, Defendants are not entitled to summary judgment on the basis of their purported independent creation of "Mike."

Defendants further argue that separate and apart from the issues of whether Defendants had access to "Excuse My Dust" and whether "Monsters, Inc." was independently created before the creation and distribution of "Excuse My Dust," they are entitled to summary judgment due to the absence of substantial similarity between any of Miller's works and "Mike" and "Sulley." In light of this Court's granting summary judgment with respect to "Character B" and the pre-"Excuse My Dust" iterations of "Character A," the Court need not consider the implications of Defendants' argument on those characters. As discussed earlier with regard to "Wise G'Eye," the Court finds that there are sufficient articulable similarities between the characters of "Wise G'Eye" and "Mike" such that the issue of whether there is substantial similarity between these characters will be left for the trier of fact to decide.

10

**B. False Designation of Origin Claim**

Miller claims that Defendants' false and misleading designation about the origin of the "Mike" and "Sullivan" characters in "Monsters, Inc." constitute violations of the Lanham Act. However, the Ninth Circuit has held that if material covered by copyright law has passed into the public domain, it cannot then be protected by the Lanham Act without rendering the Copyright Act a nullity. Comedy III Productions, Inc. v. New Line Cinema, 200 F. 3d 593, 595 (9th Cir. 2000) (citing Smith v. Chanel, Inc., 402 F. 2d 562, 565 (9th Cir. 1968)). Thus, Defendants are entitled to summary judgment on Miller's Lanham Act claim regarding "Sullivan," as Character "B" passed into the public domain over forty years ago.

Defendants' sole argument concerning Miller's Lanham Act claim is that it must necessarily fail because Miller has failed to show copyright infringement. Because this Court has found that there is a triable issue of fact as to the potential copyright infringement of the green, round one-eyed version of Character "A" as he appears in "Excuse My Dust," Defendants have not satisfied their initial burden to demonstrate the absence of a genuine issue of material fact on the issue of Defendants' designation about the origin of "Mike."

### V. CONCLUSION

For the reasons set forth above, this Court grants in part and denies in part Defendants' Motion for Summary Judgment. Summary judgment is granted on all claims related to Character "B," and the "More of the Most by Mouse #5" claims related to Character "A." Summary judgment is denied as to the "Excuse My Dust" copyright claims relating to Character "A," and the Lanham Act claim concerning Defendants' designation of the origin of "Mike." In light of this Court's Order, the parties shall appear for a scheduling conference on Monday, June 13, 2005 at 10:00 a.m. The parties shall file a joint statement setting forth their readiness for trial no later than June 1, 2005. All current pre-trial and trial dates are vacated.

Dated: May 2, 2005                           /s/ James Ware
02cv4748sj                                   JAMES WARE
                                             United States District Judge

11



**Figure 1**



**Figure 2**



**Figure 3**



**Figure 4**

**Figure 5**

**Figure 6**

12



**Figure 7**



**Figure 8**



**Figure 9**



**Figure 10**



**Figure 11**



**Figure 12**



**Figure 13**

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Barton L. Jacka jacka@shlaw.com
David R. Eberhart deberhart@omm.com
Donald G. Rez rez@shlaw.com
George A. Riley griley@omm.com
John R. Heisner heisner@shlaw.com

Sanford S. Troy
2840 Fletcher Parkway, Suite 112
El Cajon, CA 92020

T. Michael Reed
Casey Gerry Reed & Schenk
110 Laurel Street
Suite 1500
San Diego, Ca 92101

**Dated: May 2, 2005**                    **Richard W. Wieking, Clerk**

**By: /jwchambers/**
         **Ronald L. Davis**
         **Courtroom Deputy**